IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR THE COUNTY OF MULTNOMAH

| | |
|---|---|
| JEANYNE JAMES, ROBIN COLBERT, WENDELL CARPENTER, JANE DREVO, SAM DREVO, BROOKE EDGE AND BILL EDGE, SR., LORI FOWLER, IRIS HAMPTON, JAMES HOLLAND, RACHELLE MCMASTER, KRISTINA MONTOYA, NORTHWEST RIVER GUIDES, LLC, JEREMY SIGEL, SHARIENE STOCKTON AND KEVIN STOCKTON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PACIFICORP, an Oregon corporation; and PACIFIC POWER, an Oregon registered electric utility and assumed business name of PACIFICORP,<br><br>Defendants. | Case No. 20cv33885<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>CLAIMS NOT SUBJECT TO MANDATORY ARBITRATION<br><br>AMOUNT SOUGHT: OVER $600,000,000<br><br>Filing Fee: $1,178 under ORS 21.160(1)(e)<br><br>JURY TRIAL DEMANDED |

**INTRODUCTION**

1.

Plaintiffs Jeanyne James, Robin Colbert, Wendell Carpenter, Jane Drevo, Sam Drevo, Brooke Edge and Bill Edge, Sr., Lori Fowler, Iris Hampton, James Holland, Rachelle McMaster, Kristina Montoya, Northwest River Guides, LLC, Jeremy Sigel, and Shariene Stockton and Kevin Stockton individually and on behalf of a class of all those similarly, allege the following against PacifiCorp and Pacific Power (hereafter "Defendants" or collectively "Pacific Power"), based, where applicable, on personal knowledge, information and belief, and the investigation and research of counsel. On September 30, 2020, Plaintiffs provided notice and demand to Defendants for damages, and Defendants have not met that demand in the 30-day period specified by ORCP

Page 1 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 1 of 67**

32 H. Plaintiffs amend their original complaint in part to seek damages.

**<u>NATURE OF THE ACTION</u>**

2.

This lawsuit is about the thousands of Oregonians whose lives have been forever changed because of one corporation's inexcusable and indefensible wrongdoing. By leaving its power lines energized during extremely critical fire conditions on Labor Day—knowing that a historic windstorm would bring trees down onto power lines and ignite uncontrollable fires—PacifiCorp and Pacific Power caused devastation and destruction on a massive scale.

3.

People were killed. Entire towns and neighborhoods burned to the ground as businesses, schools, and homes were leveled. The victims who were able to flee often did so with no warning or time to prepare. Hundreds of thousands of acres of wildlands and watersheds will never be the same.

4.

This devastation could have been avoided if Defendants had turned off the power surging through their power lines. Instead, PacifiCorp and Pacific Power prioritized dollars over livelihoods and lives.

5.

On September 5, 2020, the National Weather Service warned that Oregon and southwest Washington were about to experience a historic wind event, where strong east winds would develop on September 7, Labor Day, and peak in the evening. The weather warning indicated that there would be wind speeds over 75 mph. As predicted, the east winds came in full force on Labor Day and hot, dry winds, along with extremely critical fire conditions, caused power lines to topple and ignite fires. The fires grew rapidly and destroyed homes, businesses, schools, trees and other vegetation—entire communities—in the Clackamas, Santiam, Salmon, McKenzie, and Umpqua River canyons, along with other parts of Oregon.

Page 2 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

**EXHIBIT 1, Page 2 of 67**

6.

Despite Defendants' knowledge about these warnings, Defendants left their power lines energized. Defendants' energized power lines foreseeably ignited massive, deadly and destructive fires that ignited and destroyed homes, businesses and schools. These fires burned over hundreds of thousands of acres, destroyed thousands of structures, killed people and upended countless lives.

7.

These catastrophic fires, so large that they were visible from space, were only the most recent consequence of Defendants' repeated failure to act responsibly in the face of wildfire risk.

8.

As a result of the fires, thousands of Oregonians—from seniors to children to families—have nowhere to call home. Many have been forced to live in shelters, campgrounds, hotels and cars, all while attempting to manage the risks of the ongoing Covid-19 pandemic.

9.

Forest fires have always been part of Oregon's landscape. Fires play an important role in naturally maintaining and regenerating the health and diversity of forests and other landscapes in Oregon. Indeed, many plant species in Oregon, such as the lodgepole pine, rely on fire to propagate. Although the fires in Oregon are typically modest in size and intensity, stand-replacing fires are not uncommon. Fires such as the Tillamook fires in Oregon's coastal rainforest, the Yacolt Burn, and the Eagle Creek Fire of 2017 in the Columbia River Gorge killed trees and reshaped the landscape for a generation. These large fires burned on the west side of the Cascade Mountains, parts of Oregon that are traditionally cooler and wetter than east of the Cascade Mountains.

10.

With climate change, fires in recent years have exhibited extreme fire behavior and burned areas of Oregon and other Western states that historically have not experienced highly destructive wildfires. As Defendants know from their own fire planning and participation in government and

Page 3 – AMENDED COMPLAINT

public utility workgroups, extreme risk of fires in Oregon is the new normal.

11.

Two things set the Labor Day Weekend fires apart from other wildfires in Oregon. First is the tragic fact that so many people lost their homes, their schools, their businesses, and their communities. Some lost their lives. Second, these losses were entirely preventable had Defendants de-energized their power lines. Fires that sprung up in the Santiam Canyon and destroyed many homes and communities, for example, were whipped to their overwhelming size by a series of ignitions caused by Defendants' power lines.

12.

Defendants knew very high winds would hit Oregon on Labor Day. Defendants knew these winds would cause trees, limbs, and debris to hit power lines, power poles, and other electrical infrastructure. Defendants knew that the summer of 2020 had been dry, with little or no rain in most of the state. Defendants knew that temperatures would be high and relative humidity and fuel moisture low. Defendants knew that the overwhelming majority of their power lines and electrical infrastructure did not use technologies to mitigate fire risk, including non-expulsion fuses, covered conductors, underground power lines, composite power poles, and fiberglass and other non-wooden materials. Defendants knew their electrical infrastructure had started other recent, destructive fires in Oregon, including the Williams Fire and the Ramsey Canyon Fire.

13.

As the Northwest Incident Management Team concluded on September 9, 2020, the fires that destroyed the homes of Plaintiffs and class members were not caused by lighting; rather, these fires were caused by a series of downed power lines. The Management Team explained, "Originally listed at 469 acres, the fire has grown overnight to over 131,000 acres driven by high winds and extremely dry fuels. Originally named the Beachie Creek fire, it has been renamed the Santiam Fire acknowledging that the Beachie Creek fire *no longer was the main cause of rapid fire growth* and was instead fed by *a series of small fires largely caused by downed power lines*

Page 4 – AMENDED COMPLAINT

*and* other ignition sources throughout the area."

14.

Defendants had a duty to properly maintain and operate their power lines, electrical infrastructure, and equipment (collectively, "power line infrastructure") to ensure they would not become a source of fires—including de-energizing their power lines to prevent fires and to allow first responders to travel the roads to put out fires in communities burning from fire ignited by those same power lines. Defendants' duty also included adequately designing, constructing, monitoring, operating, repairing, and maintaining power lines, poles, transformers, and other equipment. The duty further included maintaining the land and vegetation around power line infrastructure to ensure that vegetation, objects, and structures would not come into contact with electrical lines and equipment. Despite knowing that their electrical infrastructure was inadequate, aging, and/or vulnerable to foreseeable and known weather and environmental conditions, Defendants failed to fulfill these duties.

15.

The practice of de-energizing power lines in times of high fire risk is commonplace in parts of the West accustomed to wildfires. Other Oregon utilities did take such simple measures and did de-energize their power lines during this time period, but PacifiCorp and Pacific Power chose not to, leaving their power lines energized, and ultimately causing some of the most deadly and destructive fires in Oregon history.

16.

The catastrophic losses could have been prevented; these community-destroying fires were not inevitable. Defendants could have shut off the power, invested in their infrastructure to minimize the risk of fire, and taken other reasonable steps to operate their systems to eliminate the risk of fire altogether.

17.

As a result, PacifiCorp and Pacific Power have caused Plaintiffs, the class members, and

Page 5 – AMENDED COMPLAINT

their communities to suffer devastating property damage, economic losses, and disruption to their families, homes, communities, livelihoods, businesses, and well-being. Life will never be the same for the thousands of victims of Defendants' fires.

**PARTIES**

18.

Defendant PacifiCorp is an Oregon corporation doing business as a public utility in Oregon. Defendant PacifiCorp is a massive corporation with billions of dollars in annual revenue and a market cap in excess of $62 billion.

19.

PacifiCorp's primary place of business is in Multnomah County, Oregon at 825 NE Multnomah Street, Suite 2000, Portland, Oregon 97232.

20.

Defendant Pacific Power is a registered electric utility doing business in Oregon with its primary place of business in Multnomah County, Oregon at 825 NE Multnomah Street, Suite 2000, Portland, Oregon 97232.

21.

Pacific Power is an assumed business name of PacifiCorp. Pacific Power is wholly owned by PacifiCorp. Defendants are investor-owned. Defendants provide public utility services, including the generation, transmission, and distribution of electricity to customers in Oregon. Defendants are jointly and severally liable for each other's wrongful acts and omissions. Defendants operate as a single business enterprise out of the same building at 825 NE Multnomah Street, Suite 2000, Portland, Oregon 97232. At all times, Defendants and each of them were the agents, servants, partners, aiders and abettors, and co-conspirators of each other and were at all times acting within the scope of such agency, service, partnership, enterprise, and conspiracy. Each of the Defendants aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in breaching their obligations to Plaintiffs.

Page 6 – AMENDED COMPLAINT

**22.**

Defendants conduct regular, sustained business in Oregon and Multnomah County.

**23.**

Defendants own and/or operate power line infrastructure in Oregon to transmit, supply, transport, and provide electricity to private and public consumers.

**24.**

Plaintiff Jeanyne James is a resident of Linn County, Oregon.

**25.**

Plaintiff Robin Colbert is a resident of Linn County, Oregon.

**26.**

Plaintiff Wendell Carpenter is a resident of Linn County, Oregon.

**27.**

Plaintiff Jane Drevo is a resident of Gates in Linn County, Oregon.

**28.**

Plaintiff Sam Drevo is a resident of Gates in Linn County, Oregon.

**29.**

Plaintiffs Brooke and Bill Edge, Sr. are residents of Marion County, Oregon.

**30.**

Plaintiff Lori Fowler is a resident of Marion County, Oregon.

**31.**

Plaintiff Iris Hampton is a resident of Marion County, Oregon.

**32.**

Plaintiff James Holland is a resident of Lincoln County, Oregon.

**33.**

Plaintiff Rachelle McMaster is a resident of Lincoln County, Oregon.

**34.**

Page 7 – AMENDED COMPLAINT

Plaintiff Kristina Montoya is a resident of Marion County, Oregon.

35.

Plaintiff Northwest River Guides, LLC is an Oregon limited liability corporation with its principal place of business in Clackamas County and offices in Marion County, Oregon.

36.

Plaintiff Jeremy Sigel is a resident of Linn County, Oregon.

37.

Plaintiffs Shariene and Kevin Stockton are residents of Lincoln County, Oregon.

**JURISDICTION AND VENUE**

38.

This Court has jurisdiction over the parties and this case. Plaintiffs are citizens and residents of Oregon. Defendants are Oregon corporations, and engage in regular, sustained business in Multnomah County and maintain their principal places of business in Multnomah County. Defendants have as their principal places of business 825 NE Multnomah Street, Suite 2000, Portland, Oregon 97232. All claims alleged herein are based on Oregon law.

39.

Defendants conduct regular, sustained business activity in Multnomah County, Oregon. Defendants maintain offices, including their principal place of business, for the transaction of business in Multnomah County, Oregon. Therefore, venue is proper in Multnomah County, Oregon. ORS 14.080(2).

40.

Venue is proper in this Court. Substantial acts in furtherance of the alleged improper conduct occurred within Multnomah County and had and continue to have a profound effect in Multnomah County, where Defendants are located and made relevant decisions.

41.

Plaintiffs bring this action pursuant to ORCP 32 individually and on behalf of those

Page 8 – AMENDED COMPLAINT

similarly situated Oregon citizens to protect and seek redress for themselves, their families, and their communities. Plaintiffs were and remain citizens and residents of the State of Oregon.

<b><u>FACTUAL ALLEGATIONS</u></b>

**A.** **Defendants had a duty to safely design, build, maintain, and operate their electrical systems and infrastructure.**

42.

Defendants are a multibillion-dollar corporation that supplies electricity throughout Oregon and other states. They own, build, operate, and maintain power lines and other electrical equipment and infrastructure to transmit power to residents, businesses, schools, and other public entities in Oregon and to transmit and sell electricity in other states. Defendants own, maintain, and operate equipment throughout Oregon, including in and around the ignition points of the fires that started in and around Ashland, Detroit, Eagle Point, Gates, Glide, Idanha, Lincoln City, Lyons, Mehama, Mill City, Otis, Phoenix, Shady Cove, Talent, Tillamook, and other communities across Oregon.

43.

Power line infrastructure carries inherent dangers, as Defendants know. The inherent and heightened danger associated with the transmission and distribution of electricity requires Defendants to exercise an increased level of care to protect the public and the communities through which their power lines run.

44.

Oregon law recognizes these dangers and mandates that Defendants as public utilities must "furnish adequate and safe service, equipment and facilities." ORS 757.020.

45.

Oregon law requires Defendants to take common sense preventative actions to protect against the known risk of fire. Defendants have a duty to properly construct, inspect, repair, maintain, manage, and/or operate their power line infrastructure. OAR 860-024-0011. Defendants have a duty to keep vegetation properly cleared at a safe distance to prevent contact with power

Page 9 – AMENDED COMPLAINT

line infrastructure. OAR 860-024-0016 and OAR 860-024-0017. And, if Defendants start a fire, they have a duty to extinguish that fire or use every reasonable effort to do so. ORS 477.720.

46.

Causing timber, trees, bush, or grass to burn, except as authorized by permit, is prohibited by law. PacifiCorp admitted this in its answer and amended answer in *United States of America v. PacifiCorp et al*, No. 6:15-cv-01350-AA (D Or Oct. 5, 2015) (ECF 12 ¶ 13; ECF 31 ¶ 1), an earlier lawsuit arising from the Williams Fire started by Defendants. PacifiCorp admitted in the same case that it had a duty to use reasonable care with respect to its maintenance of electrical lines to avoid destroying the property of others. PacifiCorp further admitted "that the fire resulted from and, was caused by, the construction, operation, maintenance and/or use of PacifiCorp Transmission line facilities which were in the exclusive control of PacifiCorp." PacifiCorp further admitted that it was "solely liable to the United States for the reasonable and necessary expenses incurred in the fire's suppression and the remediation/restoration of burned areas and affected lands."

47.

According to PacifiCorp's answer in the same lawsuit, PacifiCorp paid a private landowner whose property PacifiCorp burned in the Williams Fire and paid the United States for damages caused by PacifiCorp from the Williams Fire.

48.

More recently, in June 2020, the U.S. Attorney's Office in Portland, Oregon announced that PacifiCorp paid to settle allegations by the United States in connection with the Ramsey Canyon Fire.

49.

While the Williams Fire burned approximately 8,395 acres and the Ramsey Canyon Fire burned approximately 1,888 acres, the fires ignited by Defendants on Labor Day 2020 were far larger and resulted in the loss of human life.

Page 10 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 10 of 67**

**B.** **Defendants were aware of the heightened risk of wildfire and the factors relevant to the decision to shut off power.**

50.

Oregon lawmakers have recognized that the state's electrical infrastructure poses real and significant wildfire threats. As Governor Kate Brown's Wildfire Counsel explained in its Recommendations on Utility Preparedness, "As the frequency, intensity and duration of wildfires has increased in the West, there is a need to have electrical companies take measures to reduce the risk of these events. For example, powerline fires are on average 10 times larger than fires from other causes…".[1] In California, of the top 20 most destructive wildfires in state history, eight were power line fires and six occurred between 2015 and 2017.

51.

The Governor's report also said, "Due to the often remote location, powerline fires have the potential to be larger than fires from other causes. Suppression of these fires during extreme weather conditions has become less effective. Reducing the risk of transmission-caused wildfire will have a direct and positive benefit to Oregon's effort to reduce human-caused wildfires." The report stated that "…Oregon must ensure its electrical utilities implement best-practice risk mitigation strategies to reduce human-caused ignitions."

**C.** **Defendants' statements to regulators reveal that Defendants knew the risks and chose to ignore them.**

52.

More importantly, Defendants knew the risks associated with power line infrastructure and fire. On June 18, 2019, Pacific Power testified before the Oregon Public Utility Commission ("PUC") about Pacific Power's wildfire mitigation plan. David Lucas, Pacific Power's Vice President of Transmission and Distribution Operations, said, "One thing we are trying to do through this process is to leverage some of the best industry practices and the lessons that we've

[1]https://www.oregon.gov/gov/policy/Documents/Utility%20Preparedness%20for%20Wildfires%2009232019%20(3).pdf, last accessed October 29, 2020.

Page 11 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

**EXHIBIT 1, Page 11 of 67**

learned throughout the industry to ensure that we can continue to provide safe and reliable power to the communities that we serve and the folks that...depend upon that on a daily basis."

53.

Pacific Power presented slides as part of its June 18, 2019 testimony, claiming it uses "Risk-Based Approach" to fire, including "Utilizing fire threat modeling concepts, areas were identified in Oregon where there is an elevated risk of utility-associated wildfires to occur and spread rapidly, and where communities face an elevated risk of damage or harm from wildfire." Defendants knew as well that during critical, extremely critical, and elevated fire conditions like those present on Labor Day, areas that Defendants had not previously designated as being at "elevated risk" could experience catastrophic fires caused by power line infrastructure.

54.

Defendants were also highly attuned to the background monitoring needed to track the likelihood of fire threat. Heide Caswell, Pacific Power's Director of Transmission and Distribution Asset Performance, testified on June 18, 2019 before the PUC that as "foundation we have that focus on situational awareness." She explained this included weather monitoring, aggregating weather data, localized weather information, and partnering with Oregon Department of Forestry. Ms. Caswell added that Pacific Power "tried to recognize" "methods that were taken from modeling risk in California—basically been over the last five years that they've developed a high fire threat district map if you will, which looked at the possibility of a catastrophic, quickly spreading wildfire."

55.

Pacific Power further presented to the PUC on June 18, 2019, that "situational awareness" at the company included "Public Safety Power Shutoff (PSPS) during Extreme Risk Days where thresholds for wind and low precipitation have been exceeded," along with "Utilization of protection and control settings during Red Flag Warning Days, which require additional field patrols before re-energizing lines after fault event."

Page 12 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

**EXHIBIT 1, Page 12 of 67**

56.

Significantly, the June 18, 2019 presentation to the PUC demonstrates that Defendants had identified and were aware of the factors relevant to decision-making about shutting off power during times of high fire risk. One of the PUC commissioners asked Pacific Power on June 18, 2019, if it would articulate the conditions for a PSPS in Oregon, such as windspeed criteria and drought criteria. Vice President Lucas told the PUC, "I think there is some reluctance on our part given that those numbers—I mean this is going to be an iterative process as we look at the specific input criteria for decision-making purposes...currently, we consider those plans internal and operational and are somewhat concerned about you know getting stale data out in the public that we would never be able to get back, so right now internal."

57.

Soon after, in a June 25, 2019 fact sheet entitled "Wildfire Safety and Preparedness Frequently Asked Questions," Pacific Power wrote, "Q: Why would a Public Safety Power Shutoff happen? A: While we work hard to clear plants away from our power lines, debris, tree limbs and other material can be blown onto lines during times of extreme weather conditions, such as high winds. A spark could lead to the rapid spread of wildfire when strong winds are combined with high temperatures, low humidity and other conditions. In these cases, turning power off in areas experiencing extreme weather conditions may be necessary to ensure the safety of the community."

58.

In an August 2019 PowerPoint presentation at the "West Coast Utility Commissions – Wildfire Dialogue," Pacific Power wrote regarding "Public Safety Power Shut-Off Key Points," "For public safety, PSPS would occur only when key triggers are forecasted to be reached; it is generally expected that these events will be infrequent based on normal weather patterns." Pacific Power further noted the key triggers "include a fire-fighting based drought index, a fire weather index and forecasted wind speeds."

Page 13 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 13 of 67**

59.

In the same PowerPoint, Pacific Power recognized that the likelihood of wildfire was higher than ever before, stating "Environmental conditions have changed increasing the frequency and severity of wildfires," "Powerline fires are on average 10X larger than fires from other causes," "Suppression of fires become less effective during extreme weather events," and "Utility outages and line faults increase during extreme weather events."

60.

Defendants also identified fire risks and wrote about them in a May 21, 2020 report, stating "[u]tilizing fire threat modeling concepts, areas were identified in Oregon where there is an elevated risk of utility-associated wildfires to occur and spread rapidly, and where communities face an elevated risk of damage or harm from wildfires."

61.

On June 26, 2019, Pacific Power Vice President Scott Bolton spoke with KATU news about shutting off power because of fire conditions. Mr. Bolton said, "Really, [it] is to keep the public safe and to prevent catastrophic wildfires. We think that's the right thing to do. We can't go another fire season without considering this tool." Mr. Bolton also told KATU, "We can't watch what happened in California and not be motivated to take steps to avoid the same catastrophe in our communities." And, "The power shut-off protocol is really emerging as an industry-best-practice."

62.

In the same June 26, 2019 article, KATU quoted Oregon PUC Commissioner Tawney saying "To help prevent the devastation experienced by California last year, wildfire prevention and control are high priorities for Oregon. Our goal is to mitigate wildfire risk caused by the electricity sector, which may require the implementation of Public Safety Power Shut-offs in extreme cases. This is not a new practice for electric utilities, but one that is certainly more visible now due to California's experience. The Oregon Public Utility Commission is hosting a series of

Page 14 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

meetings to further discuss wildfire mitigation to help ensure the safety of utility customers across the state."

63.

In a May 29, 2020, Wildfire Safety and Mitigation webinar presented by Heide Caswell, Pacific Power's Director of Asset Performance and Wildfire, and Allen Berreth, Pacific Power's Director of Delivery Assurance, Defendants said their wildfire risk mitigation plan included "being situationally aware of both short-term and long-term risks." Defendants said their short-term awareness was "supported by monitoring fire weather conditions" and "altering operational practices during fire risk periods." Defendants said their wildfire risk mitigation plan included "Ensur[ing] facilities are resilient to limit potential for ignition," and "React[ing] rapidly to fault event that limit arc-energy."

64.

In the same webinar, Defendants described differences between standard fuses that are found throughout Defendants' infrastructure with nonexpulsion fuses, sometimes called fire safe fuses. Defendants said, "a standard fuse . . . when it experiences that fault current could emit hot metal particles that could come into contract with fuel near that location." Whereas for a nonexpulsion fuse, "if it operates because of fault current, any potential emissions" are contained within the fuse body.

65.

Also in the May webinar, Defendants described its Public Safety Power Shutoff as "a last resort measure in our wildfire mitigation plan. But in the event of extreme wildfire weather conditions, we might initiate a PSPS. This is a proactive measure to shutoff power during weather conditions that could result in a catastrophic wildfire. Now what leads up to that there's no single factor that drives a PSPS and each one is a unique situation. It takes into account the weather, how dry it is, hot, windy days, it takes into account local information by reaching out to emergency services, local officials, our own fuels employees to get a sense of what's really going on in a

Page 15 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 15 of 67**

community, what would be the impact of a PSPS event?  What is the duration of the forecasted weather.  All of these things come together in the decision making in whether or not as PSPS event will occur."

66.

Defendants went on to say, "A PSPS event will last as long as the extreme wildfire weather conditions exist."  Defendants described a PSPS as being very similar to a planned outage—that a PSPS uses the same tools and controls to de-energize a line and communicate with customers, as in any other planned power shutoff.

67.

At least as recently as May 29, 2020, Defendants had never done a PSPS, even during critical and extremely critical fire conditions.  Defendants said in the webinar, "As we've stated, based on the historical weather information available to us, it is a rare event.  And so we wouldn't be expecting one to have occurred so far.  But that is not to say we are not monitoring the weather constantly during fire season and keeping an eye on it and even noticing if we are approaching a watch scenario."

68.

Regarding monitoring weather conditions and coordinating with other utilities, Defendants said in the webinar, "There is a lot of weather data available and we need to make sure and incorporate all of that into understanding what is going on very locally."  And "That's not to say we couldn't be in coordination with a neighboring utility to give them our status and what we're thinking and to what they might be doing during the same event."

69.

Defendants ended the webinar with the statement that "Keeping your community safe is job #1."

70.

In August 14, 2020 Surrebuttal Testimony before the PUC, Docket No. UE 374, Exhibit

Page 16 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 16 of 67**

PAC/3300, Etta Lockey, Pacific Power's Vice President, Regulation wrote, "Finally, the hardening of the Company's system against wildfire threat benefits shareholders and customers. It is in the public interest to ensure the safety of the Company's customers, employees, and facilities, and ensure the Company continues to provide safe, reliable service."

71.

Defendants' public statements to out-of-state regulators provide further proof that Defendants knew the risks and chose to disregard them. In a February 7, 2020 report from Defendants to the California Public Utility Commission, titled "2020 California Wildfire Mitigation Plan," Defendants began the Executive Summary with, "Wildfire has long been an issue of notable public concern, especially for electric utilities that have always needed to mitigate the potential for a wildfire sparked by an electric facility. As discussed below, the California Public Utilities Commission (CPUC or Commission) has worked to address the specific risks created by operation of an electric grid with targeted regulations and programs since at least 2007. PacifiCorp, in California d/b/a PacifiCorp, has been an active participant in these proceedings. However, decades of trends in the growth of wildfire frequency, size and intensity have magnified these concerns and necessitated a more intensive prevention and response paradigm. At the same time, increasing and widespread human development in the wildland-urban interface has increased the areas where people (and their residences) are intermixed with, or located near, substantial wildland vegetation. This has exacerbated the costs of wildfire damage in terms of both property damage and loss of human life. The November 2018 Camp Fire presents a devastating recent example; this fire decimated the city of Paradise and resulted in the death of 87 people." David Lucas, Defendants' Vice President of Transmission and Distribution, executed the report under penalty of perjury on February 5, 2020, on Defendants' behalf.

72.

According to the same February 7, 2020 report, Defendants told the California PUC that in 2019 they had 1,122 "Near Misses" or "Number of all events (such as unplanned outages, faults,

Page 17 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

conventional blown fuses, etc.) that could result in ignition, by type according to utility-provided list (total)." This included "80" events of "wires down." And Defendants reported that "311" of the "Near Misses" occurred during fire season. Further, Defendants disclosed "14" as the "Number of utility wildfire ignitions" in 2019 alone. "9" of the 14 fires Defendants started were outside of a "High Fire Threat District."

73.

According to a Wildfire Media Background FAQ prepared by the PUC after the Labor Day fires, Defendants "have filed applications for deferrals, seeking permission to track increased costs related to the Labor Day windstorms and wildfires. The PUC has not taken action on these deferrals yet, and will be examining the nature and scope of these requests to determine whether they should be granted." This is the first step by Defendants to attempt to shift the cost for their misconduct to customers.

74.

In short, Defendants knew about the risk of catastrophic wildfire from their power line infrastructure and knew what they could do to address it, but they chose not to act.

**D. Defendants were aware that all the factors necessitating a power shutoff were present on and after Labor Day 2020 but did not take reasonable precautions.**

75.

As alleged in this Complaint, Defendants have long been aware of the effectiveness of de-energizing power lines as a tool to guard against wildfire. They knew what factors should lead to a decision to shut off power. They knew the deadly and destructive consequences of leaving power lines energized during summer windstorms. In a set of Frequently Asked Questions ("FAQ") available on Pacific Power's website as recently as October 9, 2020, in answer to the question "What could trigger a Public Safety Power Shutoff," Defendants said:

"High wildfire risk areas identified on the interactive map could experience a Public Safety Power Shutoff when on-the-ground factors and weather conditions create an extreme wildfire risk that could lead to loss of life, catastrophic damage and be

Page 18 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 18 of 67**

difficult to fight.

We look at a range of factors before considering using a Public Safety Power Shutoff for community safety.

- Dry trees and brush and other potential wildfire fuel
- High, sustained winds
- Extremely low humidity
- Current and forecasted weather conditions from multiple third parties and our own weather stations
- Population density
- Real-time observation from on-the-ground experts
- Input from local public safety and health agencies

No single factor, such as high winds, would necessitate a Public Safety Power Shutoff."

76.

Leading up to and during Labor Day, Defendants knew days in advance that *every one of these factors* was present across Oregon in the areas that burned on and after Labor Day. According to all of Defendants' knowledge of power line infrastructure, the risk of utility-caused fire, and the effectiveness of a power shutoff in preventing fire—stated repeatedly both to regulators and the public—the presence of these factors should have left Defendants no choice but to de-energize power lines.

77.

PacifiCorp's Chief Executive Officer Stefan Bird, and David Lucas, its Vice President of Transmission and Distribution, testified on October 1, 2020 before the PUC about the Labor Day fires. Mr. Bird acknowledged that the Commission had hosted multiple discussions on the growing threat of wildfire across the region. About the Labor Day fires, Mr. Bird said, "Words are inadequate to describe the loss, personal hardship and sacrifice." Mr. Bird went on to describe the "epic windstorm" on Labor Day.

78.

Rather than addressing his company's role in igniting fires, Mr. Bird touted donations given by the Pacific Power Foundation and touted the company's development of a "comprehensive, multi-aspect, multi-year wildfire mitigation plan" in 2018.

Page 19 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

**EXHIBIT 1, Page 19 of 67**

79.

Defendants' plan for "Public Safety Power Shutoffs" were only available in "Fire High Consequence Areas" Defendants determined to be at "increased risk of catastrophic wildfires." In the May 21, 2020 report discussed above, Defendants said they used "Fire High Consequence Areas" to prioritize wildfire mitigation initiatives, such as increased inspections, system hardening, and modified operating practices.

80.

Despite their awareness of the increased risk of wildfire throughout the region, Defendants identified only 17% of their overhead power lines in Oregon as "Fire High Consequence Areas."

81.

Fires started by Defendants on Labor Day were not in areas Defendants identified as "Fire High Consequence Areas." Consequently, Defendants had no plan to shut off the power in the communities that burned, despite extremely critical fire conditions on Labor Day.

82.

The severe destruction in and near the Santiam Canyon, Southern Oregon, the Coast Range, and other areas of Oregon, shows—contrary to Defendants' conclusions—that these areas should have been identified as "Fire High Consequence Areas" and subject to heightened wildfire mitigation initiatives. But Defendants failed to shut off the power in these areas, even in extremely critical fire conditions like those present on Labor Day.

83.

Even without identifying areas as "Fire High Consequence Areas," Defendants knew that it was critical to manage and safely operate power lines in the face of fire risk that could emerge anywhere in Oregon, in the right conditions. In addition to shutoffs, Defendants had other options and tools available to them, including putting power lines underground, increasing inspections, modernizing infrastructure, replacing small-size wiring with larger-size wires that are less susceptible to breaking, disabling reclosers, using non-expulsion fuses, and developing and

Page 20 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

**EXHIBIT 1, Page 20 of 67**

implementing protocols statewide to de-energize power lines in emergency situations, including during summer windstorms.

84.

Along with these tools, on information and belief, Defendants used devices called "reclosers," which immediately attempt to restore power after a fault. For at least 30 years, utilities have known that reclosers start fires. If, for example, a power line breaks and falls into a tree or bush, a recloser will attempt to resume the flow of electricity, igniting a fire. Defendants knew or should have known to not use reclosers during fire season or to disable them, including during critical and extremely critical fire conditions.

85.

Defendants knew as well that vegetation management and infrastructure hardening were important tools to minimize or eliminate fire risk. Pacific Power's vegetation management and inadequate infrastructure hardening caused and contributed to the fires. Pacific Power's four-year trimming cycle for vegetation management was too long, allowing vegetation to encroach on power lines and increasing the risk that vegetation would contact power lines and ignite fires. On information and belief, Defendants were incentivized to not replace power poles and other equipment until the equipment was damaged because of agreements relating to paying for the cost of replacement.

86.

In the weeks since the fires began, Defendants or people acting on Defendants' behalf have contacted victims and asked victims to allow Defendants to remove fire-damaged and other trees that are outside of Defendants' easements but that could fall on power lines.

87.

Defendants even maintain firefighting equipment, including water tankers, pumps, and skid-tanks to respond to fires, demonstrating they know of fire risks associated with their electrical infrastructure. Nevertheless, Defendants did not use their firefighting equipment or otherwise

Page 21 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

extinguish any of the fires ignited by Defendants that damaged or destroyed Plaintiffs' property.

**E.     Defendants knew of the extreme weather and elevated fire risk present in Oregon during Labor Day weekend.**

88.

According to the National Interagency Fire Center and U.S. Drought Monitor, wildfire potential in Oregon in 2020 was above normal, due in part to extreme drought conditions on both sides of the Cascade Mountains.

89.

Beginning no later than September 5, 2020, the National Weather Service began warning of fire weather conditions along the West Coast, in proximity to the Cascade Mountains.

90.

By September 6, 2020, the National Weather Service warned of extremely critical fire weather on Labor Day for parts of Northwest Oregon from the Cascades to the Coast Range, and critical fire weather for other parts of the state.  The National Weather Service warned, "[e]asterly winds gusting to 50+ mph and RH [relative humidity] dropping below 20% will foster very favorable wildfire-spread conditions given very dry fuels between the Coastal Ranges/Cascades."

91.

On September 7, 2020, Labor Day, at 8:58 a.m. (Pacific), the National Weather Service issued another warning, beginning with "…EXTREMELY CRITICAL FIRE WEATHER AREA FOR PORTIONS OF NORTHWESTERN OREGON…."  The warning included wind speeds of up 75 mph, 15-25% relative humidity, and very dry fuels.  The warning explained that the combination of wind, humidity, very dry fuels, and high Energy Release Conditions "will create a volatile environment supportive of rapidly spreading fires exhibiting extreme behavior."

Page 22 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 22 of 67**

92.

The Energy Release Component reached a record high around Labor Day. Fuel moistures were near record lows for the summer on Labor Day. It was obvious from weather models and forecasts that there would be a historic wind event on Labor Day.

93.

During this time period, Defendants were monitoring the increasingly dire fire weather forecasts, including information from the National Weather Service, and even posted about the forecast on social media. On the morning of Labor Day, Pacific Power posted to Facebook about high winds forecast for later that day, along with a "Red Flag Warning." One commenter on Pacific Power's Facebook page posted, "I am writing to raise awareness of a way Pacific Power can prevent fires. We get several power pole fires whenever we get a wind event…."

94.

Pacific Power's Twitter feed, under the username @Pacific Power_OR, included a warning on Labor Day: "High winds are forecast for later today in many parts of our area." In the same tweet, Pacific Power re-tweeted the National Weather Service Portland's tweet that the area was "on track for an eventful 24-48 hours of weather, starting this afternoon."

95.

By mid-day on Labor Day, before the high winds hit Oregon, downed power lines in Eastern Washington had ignited fires.

96.

On Labor Day, Pacific Power tweeted that its "crews are responding to multiple scattered outages," and warned people to "Please stay away from any downed power lines. Always assume a downed line is energized." Pacific Power also noted "the severe windstorm" and "extremely high winds" in tweets that day. That day, winds gusted to more than 90 mph in the Coast Range and over 100 mph in the Cascades on Labor Day.

Page 23 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

97.

Before midnight on Labor Day, there were multiple first responder reports of people trapped and unable to evacuate because of fire and roads blocked by debris, including trees, limbs, and power lines.

98.

At 3:51 a.m. on September 8, 2020, many hours after the winds arrived and after fires across the state had destroyed homes and communities, Oregon State Police reported seeing power lines down across Highway 22 that were still arcing. Even then, Defendants failed to de-energize their power lines.

99.

Later on the morning of September 8, 2020, Pacific Power issued a press release blaming the "devastating wind storm" for causing power outages throughout Oregon, while also saying "low humidity and long term drought conditions set off fires throughout Oregon." But humidity and drought do not start fires—fire needs an ignition source. Pacific Power said nothing in the press release about its power lines starting fires. Pacific Power did say, however, "we also realize that there is more at stake here than power lines. People are losing their homes and businesses and we urge everyone to be safe and follow guidelines from local authorities and be ready to evacuate when ordered to do so."

100.

Defendants knew of the elevated risk that downed power lines, falling trees and limbs, failing power poles, and other power line infrastructure could start fires. Defendants knew that deferred and/or inadequate maintenance, deferred and/or inadequate thinning, and deferred and/or inadequate fuel reduction near and along power lines increased the risk that power lines would start fires. Defendants knew that high winds, high fuel loads, high temperatures, low relative humidity, low fuel moisture, high Energy Release Conditions, and topography increased the danger of fires, and that all of these conditions were present in and around Ashland, Detroit, Eagle

Page 24 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 24 of 67**

Point, Gates, Glide, Idanha, Lincoln City, Lyons, Mehama, Mill City, Otis, Phoenix, Shady Cove, Talent, Tillamook, and other communities across Oregon on Labor Day.

101.

Defendants also knew that any fire that was sparked would be impossible to contain until the weather changed, due to high winds, dry conditions, high fuel loads, topography, high Energy Release Conditions, limited escape routes, limited access for firefighters and emergency personnel, and limited firefighting resources available due to fires in other states. While Defendants sent warnings and alerts to their customers in Oregon about the risk of power lines brought down by winds, Defendants ignored the implications of their own warnings.

102.

Defendants failed to use reasonable care in leaving power lines energized despite the National Weather Service's warnings that fire danger in Oregon on Labor Day would be at "critical" and "extremely critical" levels, low humidity, long term drought, and other information about the relationship between power lines and the elevated risk of fire known to Defendants.

103.

Other owners and operators of power lines in Oregon shut off power lines in parts of Oregon on Labor Day weekend because of the fire danger. These other owners and operators made public announcements in Oregon well in advance of the shutoffs, including in major media outlets, alerting everyone (including Defendants) that because of the elevated risk of fire, electricity would be temporarily shut off.

104.

Despite elevated fire danger on Labor Day 2020 in Oregon, Defendants did not shut off power lines that they owned and operated in areas of Oregon that were at elevated risk of wildfire.

105.

Firefighting resources were already stretched thin nationally on Labor Day because of large fires already burning across the West. The fires ignited by Defendants on Labor Day immediately

Page 25 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 25 of 67**

overwhelmed first responders. With no more firefighters to respond, citizen volunteers from communities in the Willamette Valley to the Coast put their health and safety on the line to fight fires, save homes and structures, help people evacuate, and clear blocked roads.

106.

The fire risk conditions that existed in other parts of the State during Labor Day weekend were present in force in the Santiam Canyon area.

107.

James Ramseyer, member services director and spokesman for Consumers Power, Inc., an electric co-op in the Santiam Canyon area, in reference to the conditions on Labor Day, told the Salem Statesman Journal on September 24, 2020, "All indications to us, in our service territory, was that those areas were at very high risk." And, "We were at the highest level of danger we could be."

108.

Other electricity providers in the region also shut off power lines to protect against fires. Joe Harwood, spokesman for Eugene Water & Electric Board, told The Register Guard on September 9, 2020, that turning off the power on Labor Day was a preemptive decision to mitigate the risk of wildland fires. Mr. Harwood added, "I know people weren't happy, but the idea was not to be the cause of a fire."

109.

In contrast, Defendants, who, like Consumers Power, Inc., have power lines in the Santiam Canyon and nearby areas, told the Salem Statesman Journal September 24, 2020, "communities in Santiam Canyon are not in its designated Public Safety Power Shutoff area." And, "Pacific Power did not perform a Public Safety Power Shutoff prior to the historic windstorm. However, we did de-energize lines at the request of local emergency agencies to allow firefighters to do their jobs safely."

Page 26 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

**110.**

At the same time that it failed to take actions with regard to its power lines to mitigate the risk of wildfire, Defendants told the Salem Statesman Journal on September 24, 2020, "Our hearts go out to our communities and we will continue to provide support throughout the recovery process and beyond." Yet even while fires were destroying homes and communities, Defendants left power lines energized.

**F.    The Labor Day fires and Plaintiffs' losses**

**111.**

Thousands of victims of Defendants' fires were lucky to escape with their lives. For many, there was no warning, no evacuation notice, and no time to prepare. With few or no instructions from emergency responders or anyone else, victims were left to fend for themselves. Some victims were asleep and awakened by frantic neighbors pounding on their doors late at night on Labor Day and in the early morning hours of September 8, 2020, warning them to flee.

**112.**

For many victims, there was no guidance about where to go. From a "cauldron" of fire on Highway 22 in the Santiam Canyon, to trees and downed power lines blocking Highway 101 on the Coast, to lines of stopped traffic from people trying to escape, some who made it out of their homes found roads blocked.

**113.**

With roads blocked by fire, trees, and downed power lines, some victims fled on foot. Some had to walk for hours through woods at night with 70+ mph winds blowing down trees, relying on cellphones for light. Some people had so little time to flee, they wore only pajamas and mismatched footwear.

**114.**

Some victims had to evacuate over and over. Having fled from a fire that would destroy their homes, these victims evacuated to someone else's home or other location, only to have to

Page 27 – AMENDED COMPLAINT

evacuate again.

115.

For victims whose homes remained standing, many were unable to return home for weeks or longer.  Many victims have no insurance.  Others who had insurance had losses that exceeded coverage limits or amounts paid by insurers.

116.

Defendants continued to send some victims electric bills and energize power to destroyed homes, even after Defendants' power lines ignited fires that burned down victims' homes.

117.

Some of the fires started by Defendants, including the Beachie Creek Fire (also known as the Santiam Fire) and Echo Mountain Complex, destroyed hundreds of homes.  Other fires started by Defendants, such as the Pike Road Fire, were smaller in acreage but still destructive. Defendants own, manage, control, use, or operate power lines that run through the areas of the Beachie Creek Fire, Echo Mountain Complex, Pike Road Fire, Archie Creek Fire, Slater Fire, and the South Obenchain Fire, among others.

118.

Defendants caused fires on forestland in Oregon that burned uncontrolled.  Defendants did not take proper action to prevent the spread of fires.  The fires spread across ownership boundaries.  Fires destroyed Plaintiffs' and class members' trees, shrubs, and timber.

**G.      Across Oregon, witnesses saw Defendants' equipment spark fires.**

119.

Across the state, from the fires in the Santiam Canyon to the Echo Mountain Complex to the Pike Road Fire, witnesses saw Defendants' power lines start fires or saw sparks and flashes from Defendants' power lines.

Page 28 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

Brian Gales, the commander of Northwest Incident Management Team 13, a fire team stationed at the Old Gates School in Gates, Oregon, said at a news conference that at approximately 9:45 p.m. on Labor Day, power lines came down in the fire incident command post, causing rapid fire growth. Firefighters and others saw downed power lines start fires, including in Gates, Oregon. Below are pictures of the fire which burned down the Incident Command Post at the Old Gates School:



Page 29 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840



121.

On information and belief, first responders who found power lines in trees and brush starting fires were unable to reach anyone at Defendants to de-energize the power lines.

122.

Fires caused by Defendants sent smoke, embers, ash, odors, gases, and airborne particles throughout Oregon, causing extremely unhealthy and hazardous air quality that persisted for weeks.

123.

The photograph below, posted by Zach Urness (@ZachORoutdoors) on Twitter on September 22, 2020, shows a downed power line in Gates, Oregon at the fire incident command post.

Page 30 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840



124.

The photographs below by Zach Urness/Statesman Journal, published in the Salem Statesman Journal on September 24, 2020, also show downed power lines in Gates and damage caused by the fires in and around Santiam Canyon.

Page 31 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840



**Plaintiffs Jeanyne James and Robin Colbert's Losses**

125.

Plaintiffs Jeanyne James and Robin Colbert lived together at a house located on Rowena Avenue in Lyons, Oregon. Ms. James was the owner of the property and lived at the home for

Page 32 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

17 years.  Ms. Colbert lived in the home for the past four years and owned personal property in and around the home.

126.

Ms. James' and Ms. Colbert's property included a house and a 3-car garage.  One bay of the garage was filled with collectibles, and the other two bays were filled with tools, used for maintaining rental properties in Portland.

127.

As a result of the fire that destroyed their home, Ms. James and Ms. Colbert lost almost everything on their property, including their home, the garage and all its contents, four cars, and their personal belongings.

128.

Numerous precious and irreplaceable items were lost, including the cherished possessions of Ms. James' deceased daughter.  The only things that survived the fire are scraps of metal that did not burn.  The photographs below, of their property after the fire, were taken by Ms. James and Ms. Colbert.

Page 33 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

Page 34 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840



Page 35 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840





Page 36 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840



**Plaintiff Wendell Carpenter's Losses**

129.

Plaintiff Wendell Carpenter purchased a piece of property on North Fork Road in Lyons, Oregon just two months ago. Mr. Carpenter and his family were looking forward to spending many years living in the house there, and enjoying the peacefulness of the surrounding community, river, and woods.

130.

The fire destroyed nearly everything on Mr. Carpenter's property: it incinerated his house, a well house/storage shed, two covered fabric garages, and a regular storage building, along with all of his family's personal belongings, and the timber that was standing on the property. None of these losses were insured.

**Plaintiffs Jane and Sam Drevo's and Northwest River Guides, LLC's Losses**

131.

Before the Labor Day fires, Plaintiff Jane Drevo lived in a home she owned in Gates, Oregon on Greenway Drive. Ms. Drevo and her son, Sam Drevo, had lived in this home for over six years. They are both active members of the Gates community. The fire that burned through

Page 37 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

their community destroyed that home. The following shows the destruction of the Drevo home in Gates:

132.

As a result of the fire that destroyed her home, Ms. Drevo lost almost everything on her property, including her house, her special looms, textiles & carpets from travel (all irreplaceable), artwork, jewelry, family photographs—in short, nearly all her personal belongings.

133.

Her son Mr. Drevo, a world-champion kayaker and rafter, lost his most sentimental personal belongings as well, including photographs, medals, service awards, videos, and other items. All were one of a kind, and all of it is irreplaceable.

134.

Mr. Drevo is also the owner, member, and operator of Plaintiff Northwest River Guides, LLC, an Oregon limited liability corporation. Northwest River Guides (which has been in

Page 38 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 38 of 67**

business for 20 years in Oregon) owned real property in Gates on N. Santiam Highway that included four residences, one of which was the oldest home in Gates, built by Mary Gates. This property and dwellings served as a business base for his business, with homes rented to three families. The fires destroyed these properties. In addition to Northwest River Guides losses of real and personal property, the families living in those homes lost everything in the fires.

135.

Because the Drevo's family home on Greenway Drive and the N. Santiam Highway properties are now destroyed, Mr. Drevo does not have a home base in Gates from which to run his business. He has also lost a source of regular income from the rental properties.

**Plaintiffs Brooke and Bill Edge's Losses**

136.

Bill and Brooke Edge have lived in Gates, Oregon for the past 4 years. They owned a 1,600-square foot house on a 2.2-acre property, which included a 1,200-square foot shop and mature conifer trees.

137.

On the night of September 7, 2020, Mr. Edge saw through his living room window a huge flash accompanied by a boom followed by the glow of a fire. Around the same time, his son who was driving saw power lines arcing on the roadways. Mr. Edge then heard another boom. Soon after, their home was surrounded by fire, the sky glowing orange and then yellow. The Edge family was forced to immediately evacuate and had little time to collect any of their possessions.

138.

As a result of the fire that burned through Gates, Mr. and Mrs. Edge lost nearly everything. This photo shows their home in flames that night:

Page 39 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 39 of 67**



Mr. and Mrs. Edge lost precious and irreplaceable items, including possessions of immense personal value.

**Plaintiff Lori Fowler's Losses**

139.

Plaintiff Lori Fowler, a Navy veteran, was living in her RV—her only home—and serving as a camp host at Fishermen's Bend Recreation Area on the Santiam River. It was hot outside on Labor Day, and Ms. Fowler noticed the wind picking up around 2 pm. Having spent time in California, Ms. Fowler described the hot, dry wind as similar to the Santa Ana wind that blows in Southern California, creating dangerous fire conditions. The wind on Labor Day grew so strong that from inside Ms. Fowler's RV, the debris flying around made it sound like it was hailing. She could hear trees crashing down in or near the campground.

Page 40 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

140.

A fire crew arrived at Fishermen's Bend, apparently planning to make the campground the crew's base of operations. With the wind raging, a firefighter asked Ms. Fowler if the crew could cut down trees that they thought would cause fires if they fell on energized power lines.

141.

Around 11:30 pm, Ms. Fowler learned there was fire in the campground. Later that evening, her camp host radio broadcast that she needed to evacuate. She got in the camp host golf cart and drove through the campground alerting campers that they needed to leave immediately. The wind was so strong that a flying tree limb cracked the golf cart's windshield. Embers were flying through the air. If one large tree had fallen and blocked the campground exit, many people would have been trapped.

142.

After waking several groups of campers, Ms. Fowler returned to her RV, but the fire was already there. She fled in her car, leaving her RV. Ms. Fowler described her evacuation down the highway toward Salem as "driving out of hell."

143.

Ms. Fowler is currently staying with an acquaintance in Salem, Oregon, trying to decide what to do next.

144.

Since the fire, Ms. Fowler has had trouble sleeping. She suffers from nightmares and has dreams about choking on smoke that seem so real, they wake her up with a sensation of choking.

**Plaintiff Iris Hampton's Losses**

145.

Plaintiff Iris Hampton is a retired tailor. She owned two homes and 70 acres of timber in Marion County, Oregon, outside of Gates. Ms. Hampton's father left the property to his children, and Ms. Hampton planned to do the same. Both homes and the land—Ms. Hampton's

Page 41 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

family's legacy—were destroyed.

146.

On Labor Day, after several hours of extremely strong winds, the lights at Ms. Hampton's homes started going on and off.  Around 10:00 pm, Ms. Hampton's telephone line went dead, and the lights went out completely.

147.

There was so much smoke and ash, Ms. Hampton could barely see.  When Ms. Hampton saw a glow from fires on Potato Hill, across the Santiam River from her home, she knew she needed to flee immediately.

148.

Ms. Hampton had no warning.  She was never told to evacuate.  If Ms. Hampton had not left, she likely would have died.

149.

Because she had no warning and no time to plan what to take, Ms. Hampton frantically threw a few random items in a bag, jumped in her truck, and fled with her daughter and daughter's friend. Ms. Hampton drove west toward Salem.  The air was so smoky and filled with debris and ash that she wore a mask while she drove.  Ms. Hampton remembers a red glow as she drove down the highway.  Weeks later, Ms. Hampton still suffers from night terrors.

150.

Along with the destroyed homes and land, all of Ms. Hampton's personal property except for a backhoe and one bag of odds and ends were burned up.  Ms. Hampton has no insurance to help pay for any of her losses.

151.

Some of Ms. Hampton's timber was harvested four years ago and replanted. Approximately 10 acres of mature timber, including towering Douglas firs that Ms. Hampton had not harvested, was destroyed by the fires.

Page 42 – AMENDED COMPLAINT

**Plaintiff James Holland's Losses**

152.

James Holland lived in Otis, Oregon with two young children, 3 and 6 years old. He lived there just under a year, having moved to the coast for a job as a chef in Pacific City, Oregon.

153.

In the evening on Labor Day around midnight, Mr. Holland was at home and heard a massive "boom" followed by the power going out. The explosion sounded to Mr. Holland like a transformer blowing up. It had been extremely windy that afternoon and evening.

154.

Firefighters drove up the road near Mr. Holland's home. The firefighters came back soon after and announced using bullhorns for everyone in the area to evacuate immediately because of fire.

155.

Mr. Holland fled in his car with his two young children, pets, and one box of documents. As he drove away, the air was extremely smoky and Mr. Holland estimates that the fire was less than a quarter mile away.

156.

Mr. Holland drove toward Pacific City. Downed power lines and trees blocked roads and vehicles, including on Highway 101. People with chainsaws were clearing downed trees so drivers could make it through.

157.

Mr. Holland's home and all his personal property, along with his entire neighborhood, was destroyed in the fire. He was forced to spend money to stay in temporary lodging and is now renting a home in Neskowin. He learned from contractors that because of the high demand for rebuilding and repair, it would be at least 6 months before rebuilding could begin on his

Page 43 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 43 of 67**

home.

**Plaintiff Kristina Montoya's Losses**

158.

Plaintiff Kristina Montoya bought her property on the North Santiam Highway in Gates in 2016. She lived there with her spouse, Scott Capek, and three boys ages six, eight, and ten. The property is roughly three acres and includes many outbuildings, metal storage containers, sheds, and a large swimming pool.

159.

The Labor Day fires caused extensive damage to the inside and outside of her home. Windows and glass sliding doors exploded in the heat. Ms. Montoya still cannot go inside without getting a headache and getting nauseous due to the strong smell. Ms. Montoya and her family are currently living in an apartment in Salem.

160.

The fire largely destroyed two carports, a storage shed, and a metal storage container filled with supplies and tools the family tried to keep safe from harm—including an industrial heat pump, indoor garden lights, doors, wood 4x4's, pressure washers, and lawn mowers. The landscape was badly damaged and their pool is now full of debris. Four vehicles were damaged by heavy smoke. The fire even partially melted her' electric meter, even while it was showing power still being delivered to their home.

161.

Far more difficult than the loss of all these material things was the loss of their two pet cats, Apple and Salem, which were likely killed by fire and smoke. They also lost their peace of mind. The safe place they called home is not the same and does not feel like home anymore. And every time the wind blows, Ms. Montoya's children feel anxiety and fear that something bad will happen.

Page 44 – AMENDED COMPLAINT

**Plaintiff Rachelle McMaster's Losses**

162.

At the time of the fires, Rachelle McMaster had been living in her trailer home in Otis for approximately five years with her son. She owned the home and rented the pad where the trailer sat. She works as a housekeeper at an assisted living facility. She did not have property insurance.

163.

Ms. McMaster was at home on Labor Day. The weather was extremely windy—more so than even in a winter storm. The wind was so strong, Ms. McMaster thought trees would blow over. The wind blew furniture off her porch. Some gusts were strong enough that they made it difficult to stand.

164.

In the evening on Labor Day, the lights went out at her house. Late in the evening or early in the morning on September 8, 2020, Ms. McMaster smelled fire and saw that the sky was bright red. A family member alerted her that she needed to evacuate.

165.

Ms. McMaster first evacuated to a family member's home in Otis. She left with pets, photos, a few projects made by her son in school, blankets, and little else. Soon after, she had to evacuate again because of fire, to a church. She was there for a short time before she had to evacuate again, this time to Lincoln City. Then, when Lincoln City was evacuated, Ms. McMaster fled to Newport.

166.

Ms. McMaster's home and personal property were destroyed in the fire, along with nearly every other home in her neighborhood. The home of the family member she initially evacuated to was also destroyed.

Page 45 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

167.

With her home destroyed, Ms. McMaster found an apartment on the Coast to rent. The rent is $1,400, much more than the $400 per month she had been paying to rent the pad for her home.

168.

On September 11, 2020, Pacific Power texted Ms. McMaster that power had been restored to the home that had been completely destroyed by the fire. A few hours later, Pacific Power texted her, "PacPwr Acct Alert: A power outage may be affecting you at [her home address]. We're investigating & will send info when available. Txt STOP to end ALL txts."

169.

On September 18, 2020 and on several other days thereafter, Pacific Power sent Ms. McMaster texts about her electric bill for the home that had been destroyed.

**Plaintiff Jeremy Sigel's Losses**

170.

Plaintiff Jeremy Sigel lived with his wife and two young children in Lyons, Oregon. He ran a business out of his log home. Mr. Sigel's home and property were completely destroyed by the fire. The fire has interrupted his business operations. The destruction to his home and property was so severe, Mr. Sigel described the site as looking like "a bomb went off."

171.

On Labor Day, Mr. Sigel and his family had to evacuate from the fire with little time to prepare. He saw fire, ash, and debris flying through the air, driven by powerful winds. Mr. Sigel recalls seeing power lines coming down as he fled his home. After the fires, Mr. Sigel called Pacific Power and was told that Pacific Power had not shut off its power lines.

**Plaintiffs Shariene and Kevin Stockton's losses**

172.

Plaintiffs Shariene and Kevin Stockton bought their home in Otis, Oregon in 2003. The

Page 46 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

half-acre property is near the base of the hill known as Echo Mountain.

173.

The night the Echo Mountain Fire began, Mr. Stockton heard a crackle and saw sparks and an "arc flash''—an electrical explosion, essentially—on the hill. He saw dozens of flashes. The power went out but then came back on again, and then off and on again, many times. Using binoculars, Mr. Stockton could see smoke start to rise from the base of the hill.

174.

After a night of frantically trying to alert his neighbors by honking his horn and shouting, the couple evacuated the following morning.

175.

The Echo Mountain Fire completely destroyed the couple's property, as shown below. The Stocktons are now living in a camper trailer in a KOA campground.

**H.      Defendants' Fires Caused Extensive Harm to Plaintiffs and Class Members.**

176.

The full scope of the property damage from the fires is unknown and damages continue to accrue.  Damages and harms include but are not limited to economic loss, including loss of property, diminished value of real and personal property, loss of use and enjoyment, loss of business, loss of employment, loss of rental income, loss of timber and forest products, loss of farm products, replanting costs, evacuation and dislocation costs, relocation costs, clean-up costs,

Page 47 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

appraisal and engineering costs, attorney fees and costs, hazard mitigation, and insurance deductibles and other insurance costs, and damages to burned properties caused by smoke, gases, and airborne particles. Many of these costs are exacerbated by the ongoing global pandemic.

177.

Many victims are still homeless or staying in temporary housing, weeks after the fires started. Clean-up and rebuilding costs are still being determined. Rain, snow, and storms in the fall, winter, and spring will bring down trees weakened or killed by the fires, cause landslides, and send debris and pollutants into waterways.

178.

Fire damage and destruction has negatively impacted the value of real property, including undeveloped property and wildlands, and will continue to affect resale values and development potential for an unknown number of years. Because of the massive destruction and the ongoing global pandemic, the cost of rebuilding is higher, and victims will have to wait longer for construction to begin and be completed.

179.

The fires produced a glut of timber to be removed or harvested, thereby increasing the costs to cleanup trees and debris and depressing the price of timber. The fires have caused and will continue to cause individuals and businesses to suffer widespread economic losses that will continue for years.

180.

Victims who lost homes or were temporarily displaced have incurred and will continue to incur costs for lodging. Victims have had to pay and are continuing to have to pay for evacuation costs.

181.

Victims who lost personal property have incurred and will continue to incur costs to replace the personal property capable of being replaced—everything from vehicles to tools to

Page 48 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

farm equipment to household goods.

## CLASS ACTION ALLEGATIONS

182.

Plaintiffs bring this action as a representative party pursuant to ORCP 32, and on behalf of a class initially defined as:

> All Oregon citizens and entities whose real or personal property was harmed beginning on September 7, 2020 or later by fires in Oregon caused by PacifiCorp or Pacific Power.

183.

Excluded from the class are Defendants, any entity in which Defendants have a controlling interest or that has a controlling interest in (or is under common control with) Defendants, and Defendants' legal representatives, assignees, and successors. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.

184.

The class is so numerous, consisting of more than 1,000 members, that joinder of all members is impracticable.

185.

There are numerous questions of fact and law common to Plaintiffs and class members. Common questions include, but are not limited to, the following:

    a.    Whether power line infrastructure owned, operated, controlled, or managed by Defendants caused fires on and after Labor Day 2020 in Oregon;

    b.    Whether fires caused by Defendants damaged or destroyed homes, businesses, personal property, public buildings, and other public property;

    c.    Whether Defendants' decision to not shut off power lines was negligent and/or negligent per se;

    d.    Whether Defendants' decision to not shut off power lines caused a private and/or public nuisance;

Page 49 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

**EXHIBIT 1, Page 49 of 67**

e. Whether Defendants' decision to not shut off power lines caused a trespass;

f. Whether Defendants are liable under the doctrine of inverse condemnation;

g. Whether Defendants considered the elevated risk of fire on Labor Day, in deciding to not shut off power lines;

h. Whether Defendants were negligent in failing to use reasonable care in

i. maintaining power lines, thinning, and removing fuels in and around power lines;

j. Whether Defendants were negligent in their construction, maintenance, and operation of power line infrastructure;

k. Whether Defendants interfered with or continue to interfere with Plaintiffs enjoyment of their lives and property, and whether that interference was or is objectively substantial and unreasonable;

l. Whether Defendants have taken or have damaged the property of Plaintiffs;

m. Whether Defendants have provided just compensation for having taken or having damaged the property of Plaintiffs; and

n. Whether Plaintiffs and class members are entitled to injunctive relief, an accounting, or other equitable relief, and, if so, the methodology for determining such relief.

186.

Defendants engaged in a common course of conduct toward Plaintiffs and members of the class. The common issues of fact and law arising from this conduct that affect Plaintiffs and members of the class predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

187.

Plaintiffs' claims are typical of the claims of all class members. Plaintiffs' claims and the claims of the class arise out of the same common course of conduct by Defendants and are based

Page 50 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 50 of 67**

on the same legal, equitable, and remedial theories.

188.

Plaintiffs fairly and adequately protect the interests of the class. Plaintiffs' claims are typical of the claims of all class members. Plaintiffs have retained competent and capable attorneys with experience in complex and class action litigation. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the class and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests that are contrary to or that conflict with those of the proposed class.

189.

A class action is the superior method for the fair and efficient adjudication of this controversy. Common questions of law and fact predominate over any individual questions. Class treatment is superior to multiple individual suits or piecemeal litigation because it conserves judicial resources, promotes consistency and efficiency of adjudication, provides a forum for small claimants, and deters illegal activities. Individual members of the class will have little to no interest in controlling the litigation due to the high costs of individual actions and the expense and difficulty of litigating against sophisticated parties, such as Defendants. There will be no significant difficulty in the management of this case as a class action.

190.

This Court is experienced in managing class action litigation and is a desirable forum because Defendants conduct significant business in this county and in Oregon.

191.

Plaintiffs and the class have suffered damages and are continuing to suffer damages. On September 30, 2020, Plaintiffs, through counsel, sent Defendants a notice and demand, pursuant to ORCP 32 H, before commencing a class action for damages. Defendants have not responded to the notice and demand. Plaintiffs are not seeking to recover damages for personal injury on behalf of themselves or the class.

Page 51 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 51 of 67**

192.

Plaintiffs seek their reasonable attorney fees, costs, disbursements, expert witness fees, and investigation costs pursuant to ORCP 32, ORS 20.085, and ORS 105.810(2).

193.

Plaintiffs also seek attorney fees and costs pursuant to the Court's inherent and equitable power to award attorney fees, including but not limited to the principles articulated in *Gilbert v. Hoisting & Portable Engineers*, 237 Or 130, 384 P2d 136 (1963) and *Deras v. Myers*, 272 Or 47, 535 P2d 541 (1975). Plaintiffs bring suit in a representative capacity on behalf of the putative Class defined above and seek to protect important public rights and confer a substantial benefit on the public at large. The important rights and benefits at issue include rights protected by Article I, Section 18 and Article 11, Section 4 of the Oregon Constitution, along with statutory and common law rights discussed herein, and the right and benefit to live safe from fires caused by Defendants.

194.

As alleged herein, an action or inaction of Defendants constituted negligence or a higher degree of fault, and the action or inaction caused or contributed to the cause of the fires or caused or contributed to the spreading of the fire under ORS 477.092. Pursuant to ORS 477.089(2)(a), Plaintiffs seek to recover damages for all economic and property damage.

195.

The fires occurred as a result of recklessness, gross negligence, willfulness or malice. Pursuant to ORS 477.089(2)(b), Defendants are liable for twice the amount of damages from all economic and property damage.

196.

Pursuant to ORS 477.089(3), Defendants are liable for the full amount of all expenses incurred by any person or entity in fighting the fires.

Page 52 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 52 of 67**

197.

Pursuant to ORS 105.810(1), Defendants are liable for treble damages for willfully injuring, severing, or injuring Plaintiffs' trees, shrubs, and timber. Pursuant to ORS 105.810(3), Defendants are liable to Plaintiffs for the reasonable costs of reforestation activities. Pursuant to ORS 105.815(1), Defendants are liable for double damages. Pursuant to ORS 105.815(2), Defendants are liable for the costs of litigation and reforestation.

198.

Plaintiffs reserve their right to amend the complaint to allege claims for punitive damages.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**(Negligence)**

199.

Plaintiffs restate and incorporate the allegations above as if fully stated herein.

**Count 1: Common Law Negligence**

200.

Defendants committed wrongful acts or omissions in one or more of the following ways:

a. Defendants failed to reasonably inspect their power line infrastructure for hazardous conditions.

b. Defendants failed to reasonably clear vegetation around power line infrastructure to mitigate the risk of fire.

c. Defendants failed to reasonably de-energize power lines during critical and extremely critical fire conditions, when Defendants knew or in the exercise of reasonable care should have known that the then-present fire conditions would cause energized lines to fall or otherwise contact vegetation, structures, and objects.

Page 53 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 53 of 67**

d. Defendants failed to reasonably de-energize power lines during the then-present critical and extremely critical fire conditions even after Defendants had knowledge that some power lines had fallen or otherwise come into contact with vegetation, structures, and objects.

e. Defendants failed to reasonably de-energize power lines even after fires had been ignited by their power line infrastructure.

f. Defendants failed to reasonably implement policies and procedures, and use equipment, to avoid igniting or spreading fire.

g. Defendants failed to reasonably adjust their operations despite warnings about weather conditions that could cause rapid and dangerous fire growth and spread on and after Labor Day.

201.

As a result of Defendants' negligence, Plaintiffs suffered harm to their real and personal property.

202.

Defendants' negligence caused or was a substantial factor in causing foreseeable harm to Plaintiffs' real and personal property and other economic losses in an amount in excess of $600,000,000.

**Count 2: Negligence *Per Se***

203.

Defendants were negligent as a matter of law by failing to comply with their responsibilities under ORS 757.020, ORS 477.720, OAR 860-024-0011, OAR 860-024-0016, and OAR 860-024-0017.

204.

ORS 757.020 dictates "[e]very public utility is required to furnish adequate and safe service, equipment and facilities…". Defendants failed to furnish adequate and safe service,

Page 54 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

equipment and facilities in at least the following ways:

    a.  Defendants failed to design and build power lines, transformers, and other infrastructure in a manner that would prevent them from causing fire, electrical arcs, or sparks in high-wind events.

    b.  Defendants failed to maintain their power lines, rights of way, and other electrical infrastructure, including by failing to reasonably clear vegetation around power line infrastructure to mitigate the risk of fire.

    c.  Defendants failed to reasonably inspect their power line infrastructure for hazardous conditions.

    d.  Defendants failed to reasonably de-energize power lines during critical and extremely critical fire conditions, when Defendants knew or in the exercise of reasonable care should have known that the then-present fire conditions would cause energized lines to fall or otherwise contact vegetation, structures, and objects.

    e.  Defendants failed to reasonably de-energize power lines during the then-present critical and extremely critical fire conditions even after Defendants had knowledge that some power lines had fallen or otherwise come into contact with vegetation, structures, and objects.

    f.  Defendants failed to reasonably de-energize power lines even after fires had been ignited by their power line infrastructure.

    g.  Defendants failed to reasonably implement policies and procedures, and use equipment, to avoid igniting or spreading fire.

    h.  Defendants failed to reasonably adjust their operations despite warnings about weather conditions that could cause rapid and dangerous fire growth and spread on and after Labor Day.

205.

Defendants also violated ORS 477.720; having accidentally set fire to forestland, or places

Page 55 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 55 of 67**

from which fire could be communicated to forestland, Defendants failed to extinguish the fire or use every possible effort so to do.

206.

Defendants violated OAR 860-024-0011; Defendants failed to properly construct, inspect, repair, maintain, manage, and/or operate their power line infrastructure.

207.

Defendants violated OAR 860-024-0016 and OAR 860-024-0017; Defendants failed to keep vegetation properly cleared at a safe distance to prevent contact with power line infrastructure.

208.

Defendants' violations of ORS 757.020, ORS 477.720, OAR 860-024-0011, OAR 860-024-0016, and OAR 860-024-0017 caused or were a substantial factor in causing foreseeable harm to Plaintiffs' real and personal property and other economic losses in an amount in excess of $600,000,000.

## SECOND CAUSE OF ACTION

### (Gross Negligence)

209.

Plaintiffs restate and incorporate the allegations above as if fully stated herein.

210.

Defendants knew of the extreme fire danger that high-wind conditions posed. In fact, Defendants' fire mitigation plans specifically called for the de-energizing of its power lines during high-wind conditions. And, Oregon law authorized Defendants to de-energize its power lines in "emergencies endangering life or property." OAR 860-021-0315. Despite Defendants' knowledge of the risk of extreme fire danger in high-wind conditions, a mitigation plan that called for the de-energizing of its power lines during high-wind conditions, and the authority to do so,

Page 56 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 56 of 67**

Defendants chose not to de-energize their power lines during the then-present high-wind conditions. Defendants acted with indifference to the probable consequences of their acts and omissions because the circumstances proclaimed danger and warned Defendants of the impending disaster and Defendants did nothing.

211.

Defendants' gross negligence caused or was a substantial factor in causing foreseeable harm to Plaintiffs' real and personal property and other economic losses in an amount in excess of $600,000,000.

212.

Plaintiffs and the putative class are entitled to recover twice the amount of damages from all economic and property damage from fires caused by Defendants' gross negligence. ORS 477.089(2)(b).

**THIRD CAUSE OF ACTION**

**(Private Nuisance)**

213.

Plaintiffs restate and incorporate the allegations above as if fully stated herein.

214.

Plaintiffs have a possessory interest in the real property harmed by Defendants' Labor Day weekend fires, and that possessory interest includes the right to quiet use and enjoyment.

215.

Defendants kept power lines energized during critical and extremely critical fire conditions when Defendants knew or in the exercise of reasonable care should have known that the then-present conditions could cause energized power lines to fall or come into contact with vegetation, objects, or structures and cause fire, or otherwise cause power line infrastructure to spark, arc, or emit burning materials or electricity. Keeping power lines energized under then-present conditions constituted an objectionable condition.

Page 57 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 57 of 67**

216.

Defendants realized or should have realized that the objectionable condition posed an unreasonable risk of fire that could spread and cause harm to Plaintiffs' real and personal property.

217.

Defendants could have de-energized their power lines during the critical and extremely critical fire conditions, at little to no cost to Defendants, thereby fully eliminating the risk of fire caused by power line infrastructure.

218.

Defendants failed to exercise reasonable care to eliminate the risk when Defendants chose not to de-energize their power lines. Defendants' behavior was negligent, reckless, and/or abnormally dangerous.

219.

Defendants' energized power lines during the then-present critical and extremely critical fire conditions caused fires that substantially and unreasonably interfered with the use and enjoyment of Plaintiffs' and class members' property, have caused permanent injury to that property, and caused other economic losses in an amount to be proven at trial. Such substantial and unreasonable interference includes, but is not limited to:

a. Total destruction of Plaintiffs' real and personal property.

b. Damage to Plaintiffs' real and personal property.

c. Loss of use and ability to enjoy Plaintiffs' real and personal property.

d. Diminution in the value of Plaintiffs' real and personal property.

e. Annoyance and inconvenience.

220.

As a direct and proximate result of the foregoing conduct of Defendants, Plaintiffs suffered damages to their real and personal property and other economic loss in an amount in excess of $600,000,000.

Page 58 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

**EXHIBIT 1, Page 58 of 67**

221.

Plaintiffs and the putative class are entitled to recover twice the amount of damages from all economic and property damage from fires caused by Defendants' recklessness, gross negligence, willfulness or malice. ORS 477.089(2)(b).

**FOURTH CAUSE OF ACTION**

**(Public Nuisance)**

222.

Plaintiffs restate and incorporate the allegations above as if fully stated herein.

223.

The fires that damaged and destroyed Plaintiffs' real and personal property were caused by power line infrastructure constructed, owned, maintained, controlled or operated by Defendants.

224.

Defendants' failure to reasonably construct, operate, repair, control, or maintain their power line infrastructure created an unreasonable risk of harm that their power line infrastructure would start fires during critical and extremely critical fire conditions and then spread onto Plaintiffs' real and personal property. Defendants' behavior was negligent, reckless, and/or abnormally dangerous.

225.

Pursuant to ORS 477.064, any fire on forestland in Oregon burning uncontrolled or without proper action being taken to prevent its spread, notwithstanding its origin, is declared a public nuisance. Defendants caused fires on forestland in Oregon that burned uncontrolled and did not take proper action to prevent the spread. The fires burned across one or more ownership boundaries. Also pursuant to ORS 477.064, the spread of fire in forestland across an ownership boundary is prima facie evidence of fire burning uncontrolled.

Page 59 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 59 of 67**

226.

Defendants' negligence, recklessness, and/or abnormally dangerous behavior created a nuisance which substantially and unreasonably interfered with Plaintiffs' use and enjoyment of their real and personal property. Such substantial and unreasonable interference includes, but is not limited to:

d. Total destruction of Plaintiffs' real and personal property.

e. Damage to Plaintiffs' real and personal property.

f. Loss of use and ability to enjoy Plaintiffs' real and personal property.

d. Diminution in the value of Plaintiffs' real and personal property.

e. Annoyance and inconvenience.

227.

Plaintiffs suffered a special injury distinct from the general public from this public nuisance when their homes were destroyed and their property damaged by fires caused by Defendants.

228.

Defendants' substantial and unreasonable interference with Plaintiffs' use and enjoyment of their property constitutes a nuisance for which Defendants are liable to Plaintiffs for all damages arising from such loss of use and enjoyment, including compensatory relief, in an amount to be proven at trial.

229.

Whatever social utility Defendants' operation may provide is outweighed by the harm Defendants' operations have imposed on Plaintiffs.

230.

As a direct and proximate result of the foregoing conduct of Defendants, Plaintiffs suffered damages to their real and personal property and other economic loss in an amount in excess of $600,000,000.

Page 60 – AMENDED COMPLAINT

231.

Plaintiffs and the putative class are entitled to recover twice the amount of damages from all economic and property damage from fires caused by Defendants' recklessness, gross negligence, willfulness or malice. ORS 477.089(2)(b).

**FIFTH CAUSE OF ACTION**

**(Trespass)**

232.

Plaintiffs restate and incorporate the allegations above as if fully stated herein.

233.

Defendants were negligent, reckless, or acted intentionally in causing or allowing flames and fire to come into contact with, enter, damage, destroy, or otherwise trespass on Plaintiffs' real and personal property.

234.

The intrusion, coming into contact with, entrance, damaging, destroying, or trespassing on Plaintiffs' real and personal property was not authorized. Plaintiffs did not consent to these flames, fires, smoke, embers, ash, odors, gases, and airborne particles entering upon their real and personal property.

235.

Plaintiffs' real and personal property was in Plaintiffs' exclusive possession.

236.

Defendants knew that a trespass would result from Defendants' actions. Defendants' actions setting in motion the unauthorized entry and trespass were done knowing that a trespass would result. A trespass occurred as a result of those actions.

237.

As a direct and proximate result of the foregoing conduct of Defendants, Plaintiffs suffered damages to their real and personal property and other economic loss in an amount in excess of

Page 61 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 61 of 67**

$600,000,000.

238.

Plaintiffs and the putative class are entitled to recover twice the amount of damages from all economic and property damage from fires caused by Defendants' recklessness, gross negligence, willfulness or malice. ORS 477.089(2)(b).

239.

For Plaintiffs and class members who suffered damage to trees, timber, or shrubs on their property, Defendants' wildfires caused the injury of those trees, timber, or shrubs under ORS 105.810(1). Plaintiffs and class members owned the premises on which such trees, timber, or shrub were injured by the commission of Defendants' acts; namely, the cause of a fire. Plaintiffs and class members are entitled to treble damages for that injury to trees, timber, or shrubs as well as reimbursement of fees and costs under ORS 105.810(1)-(2).

**SIXTH CAUSE OF ACTION**

**(Inverse Condemnation)**

240.

Plaintiffs restate and incorporate the allegations above as if fully stated herein.

241.

The Oregon Constitution, Article I, Section 18, provides in part, "Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation."

242.

The Oregon Constitution, Article XI, Section 4, provides, "No person's property shall be taken by any corporation under authority of law, without compensation being first made, or secured in such manner as may be prescribed by law."

Page 62 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 62 of 67**

243.

Plaintiffs are owners of property or persons claiming an interest in property.

244.

Defendants are entities with the power of condemnation, including but not limited to under ORS Chapter 35 and the Oregon Constitution.

245.

Defendants are public entities for the purposes of the doctrine of inverse condemnation.

246.

Defendants designed, installed, owned, operated, used, controlled, managed, and/or maintained power line infrastructure in Oregon for the purpose of providing electricity to the public. Providing electricity to the public using power line infrastructure is a public improvement intended to benefit the community as a whole.

247.

Defendants caused fires on and after Labor Day 2020 which burned property owned and/or occupied by Plaintiffs. The fires took and/or damaged or destroyed Plaintiffs' real and personal property. Defendants have taken private property from Plaintiffs without adequate or just compensation. Defendants interfered and substantially interfered with the use, access, enjoyment, value, and marketability of Plaintiffs' property.

248.

Defendants intentionally undertook the actions described above, including but not limited to leaving power lines energized, having no plan to de-energize power lines in areas Defendants had not previously determined were "Fire High Consequence Areas," not clearing vegetation, not maintaining equipment, and not using firesafe equipment during high-risk fire conditions. Defendants operated their power line infrastructure during critical and extremely critical fire conditions in ways that necessarily caused the fires that destroyed Plaintiffs' property.

Page 63 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

249.

The damage to Plaintiffs was the necessary, certain, predictable, or inevitable result of Defendants' actions.

250.

The damage to Plaintiffs is disproportionate to the risks from the public improvements made to benefit the community as a whole. Justice, fairness, and the Oregon Constitution require that Plaintiffs be compensated for their injuries and the taking by Defendants rather than allowing the injuries and taking to remain disproportionately or exclusively concentrated on Plaintiffs.

251.

Plaintiffs losses from Defendants' inverse condemnation exceed $600,000,000.

252.

Plaintiffs are entitled to their reasonable attorney fees and costs pursuant to ORS 20.085.

**SEVENTH CAUSE OF ACTION**

**(Accounting/Injunction)**

253.

Plaintiffs restate and incorporate the allegations above as if fully stated herein.

254.

Plaintiffs seek an order enjoining Defendants from leaving power lines energized in areas of Oregon experiencing extremely critical fire conditions.

255.

Plaintiffs seek an order requiring Defendants to use tools and technologies to mitigate the risk of fire, including but not limited to burying transmission lines, using covered conductors and non-expulsion fuses, and disabling automatic reclosers during fire season.

256.

Plaintiffs seek an order requiring Defendants to comply with their obligations and duties pursuant to ORS Chapter 477 and ORS 757.020.

Page 64 – AMENDED COMPLAINT

257.

Plaintiffs seek an order requiring an accounting with respect to the amount of damages for Plaintiffs' first, second, third, fourth, and fifth causes of action.

258.

Plaintiffs reserve the right to amend this complaint to add a claim for punitive damages as required by ORS 31.725.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek judgment against Defendants and the following relief:

A. An order certifying the matter as a class action pursuant to ORCP 32, naming Plaintiffs as the class representative, and naming Plaintiffs' counsel as class counsel;

B. Damages in an amount to be proven at trial and not less than $600,000,000;

C. Double the amount of economic and property damages, pursuant to ORS 477.089(2)(b);

D. Where available, treble damages pursuant to ORS 105.810(1); reasonable costs of reforestation activities pursuant to ORS 105.810(3); double damages pursuant to ORS 105.815(1); and costs of litigation and reforestation pursuant to ORS 105.815(2);

E. Prejudgment interest as authorized by ORS 82.010(1)(a);

F. Injunctive relief;

G. An order requiring an accounting with respect to the amount of damages;

H. An order enjoining Defendants from leaving power lines energized in areas of Oregon experiencing extremely critical fire conditions and providing the other relief requested in Plaintiffs' Seventh Cause of Action (Accounting/Injunction);

I. An award of reasonable attorney fees, costs, investigation costs, disbursements, and expert witness fees pursuant to ORCP 32, ORS 20.085, and ORS 105.810(2), and the Court's

Page 65 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 65 of 67**

inherent and equitable power to award attorney fees; and

J.    Such other relief that the Court finds appropriate.

Dated this 30th day of October, 2020.

KELLER ROHRBACK L.L.P.


By: *s/Daniel Mensher*
    **Daniel Mensher**, OSB No.074636

1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone:    (206) 623-1900
Facsimile:    (206) 623-3384
Email:        dmensher@kellerrohrback.com

-AND-
**Matthew J. Preusch**, OSB No. 134610
KELLER ROHRBACK L.L.P.
1129 State Street, Suite 8
Santa Barbara, CA  93101
Telephone:    (805) 456-1496
Facsimile:    (503) 228-6551
Email: mpreusch@kellerrohrback.com

-AND-
**Keith A. Ketterling**, OSB No. 913368
**Yoona Park,** OSB No. 077095
**Cody Berne**, OSB No. 142797
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone:    (503) 227-1600
Facsimile:    (503) 227-6840
Email:        kketterling@stollberne.com
              ypark@stollberne.com
              cberne@stollberne.com

-AND-
**Nicholas A. Kahl**, OSB No. 101145
NICK KAHL, LLC
209 SW Oak St., Suite 400
Portland, OR  97204
Telephone:    (971) 634-0829
Facsimile:    (503) 227-6840
Email:        nick@nickkahl.com

Trial Attorney:  Keith A. Ketterling

Page 66 – AMENDED COMPLAINT

**CERTIFICATE OF SERVICE**

I hereby certify that I served a true copy of the foregoing AMENDED CLASS ACTION COMPLAINT on defendants pursuant to ORCP 9 via Certified Mail at the following addresses:

| | |
|---|---|
| PacifiCorp and Pacific Power<br>825 Multnomah Street<br>Suite 2000<br>Portland, OR 97232 | PacifiCorp and Pacific Power<br>780 Commercial Street SE<br>Suite 100<br>Salem, OR 97301 |

I hereby declare that the above is true to the best of my knowledge and belief. I understand that this document is made for use as evidence in court and is subject to penalty of perjury.

DATED:  October 30, 2020

Signed: *s/ Daniel Mensher*

Daniel Mensher, Attorney for Plaintiffs

Page 67 – AMENDED COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

**EXHIBIT 1, Page 67 of 67**